Good morning, Your Honors. I am Donald A. Garrard on behalf of the appellant, Claudia Wang, M.D. I checked again this morning. It is pronounced Wong, although it is spelled Wang. With that, Your Honor, I would like to reserve five minutes for rebuttal. Go ahead. The record evidence presented to the district court in this matter discloses that Claudia Wang did everything that a reasonable and conscientious pediatrician with special training in child abuse detection and prevention should have done on the afternoon of March 5th, 2010. The district court, in denying summary judgment, listed four scenarios, which are found at volume one of the excerpts of record, pages 25-26, that I have characterized as number one, a consent to admission to the hospital freely and voluntarily given. Everybody agrees that would not involve any constitutional violation. Then scenarios two and three, scenario two I have characterized as a misrepresentation or an incomplete disclosure of medical necessity. Number three was a concealment of a fact which the Plaintiff Jones' contend needed to be disclosed. That was the results of the CT examination completed around 5 p.m. or shortly after 5 p.m. on the afternoon of March 5th. And the fourth scenario that the district court listed was coerced consent, that is that the Joneses did not feel free to leave. Specifically, the interaction between the parties was limited on the afternoon of March 5th to Jill Jones and Dr. Claudia Wong at the ambulatory pediatric clinic at UCLA, located in 200 Medical Plaza, which is adjacent to the Ronald Reagan Hospital, where the Joneses eventually went on that evening and remained there until the following morning when they went to. Since your time is limited, let me just ask. Certainly. What's the best case as to how the circumstances here and the Joneses' consent to admitting C.J. would have been considered voluntary and informed? There's no case law on the landscape that defines a doctor's duty of disclosure in this situation. There is none. There is Cobbs v. Grant, which is a California Supreme Court case, which says that if a doctor proposes a procedure or a risk or treatment that involves a known risk of serious injury or death, that must be disclosed in order to obtain the patient's consent. There's a case of Tarasoff v. Regenstein, a California Supreme Court case, which imposed a duty on a psychiatrist or a mental health care provider to disclose a credible risk of injury. But aside from those two cases, Your Honor, there is no cases which define the disclosure obligations of a physician faced with what Dr. Wong was faced with on the afternoon of March 5th. So if that is true, then from your point of view, there is no constitutional right of 100 percent disclosure. That is correct, Your Honor. So if that's the case, is your client entitled to qualified immunity? Well, we contend that she's entitled to qualified immunity because there is no case on the landscape that gave her fair warning. I have another question real quickly. She is really acting in almost a dual capacity. If she were acting as a social worker, she would have gotten qualified immunity for her actions at that time. Absolutely. But as a doctor, that's not covered by the state statute. It's unclear. There's no cases out there for her to learn from. And she's faced with a very difficult and developing factual situation, building to a crescendo of what the heck is really going on in that household out of my presence that might put this child at risk. So if she sends the child home and there's further injuries or death, then she's liable for that because that may not be the standard of care. That is absolutely correct, Your Honor. Did the plaintiffs come forward, to your knowledge, with any declarations, affidavits from any doctor anywhere that suggests what Dr. Wong did was inappropriate? They did not. And the record in the district court is devoid of any such evidence. What about Ferguson? In Ferguson v. City of Charleston, it suggests that under the Fourth Amendment, when doctors undertake to obtain incriminating evidence from their patients, for the specific purpose of incriminating those patients, they have a special obligation to make sure that the patients are fully informed about their constitutional rights as standards of knowing waiver require. Why has she not violated that? Because, Your Honor, there was no preconceived plan with law enforcement to conceal the fact that the child abuse investigation was pursuing. The record in the district court is absolutely compelling of the conclusion that Ms. Jones knew that her presence at the hospital, that the testing of G.J., was being undertaken as part of a child abuse investigation. That is not in dispute. She knew that Claudia Wong was a child abuse investigator. She knew that Claudia Wong was the head of UCLA's suspected child abuse and neglect team. Dr. Wong, her sole purpose was to investigate, was it not? No, it was not. Her predominant purpose was to protect this child. Well, okay, maybe. And that is what she testified to. That's what's in the record. In doing so, she was investigating. She wore more than one hat, Your Honor. She was a mandated reporter. She was also a physician. And that's what makes this case very difficult, and that's why I'm trying to figure out what were the obligations. And I think the courts put its finger, if I can use the analogy, on the same dilemma that the district court had and expressed several times. And what if we have to look at this in the light most favorable to the plaintiff? Absolutely. That is the law, and that's what we're doing. If you look at what we think is the more persuasive evidence, there is little doubt, no doubt, that Jill Jones consented to the admission. But to go back to your original question, it's not disputed that Dr. Wong wanted to conduct blood testing and to have G.J. examined by pediatric nephrologists to opine on whether there was any evidence of a condition called osteopenia imperfecta, which is a congenital condition known to produce brittle bones. Correct. Which could have helped explain why this child had multiple fractures from a stairway accident when the pediatric literature tended to exclude that in a high degree of certainty. Well, also, didn't the doctor have a substantial career of examining these types of allegations on a daily basis? Yes, Your Honor. She's been to her lexicon of belief of the immediacy and the emergency nature of what he had to go on. Because I come back to some cases that were not cited or did not cite in detail. Devereaux, Mueller was addressed, but the Baker cases. And they talk in there, in the final synopsis, of the difficulties faced by these kinds of individuals and or investigators or anybody else of these emergent situations that don't just fit into that. If you look at it on an individualized basis, what they're confronted with, versus the broad parameters of you can't take my child without due process of law. And so what do you do in the interim there to try and, I'd say a TRO, to maintain the status quo? What do you do with that if you're the doctor? That is what was presented to Dr. Wong, Your Honor. I'm not familiar with Devereaux. I know I've seen Devereaux. Baker, I don't believe I have. The Mueller versus Alker cases, I think I'm familiar with. The worry that I have, I guess, is that while I appreciate what my colleagues have said, it seems to me I have to take this case as presented by the plaintiffs, and I have to give full, if you will, deference to what they say. And it seems to me that as to Dr. Wong's conduct, even before the warning by the social worker, Wong recommended a CT scan in the hospital to rule out the possibility of a new skull fracture. And even after knowing about the results of the CT scan, she still didn't tell the parents about it for two hours, and then didn't tell them that they could go home. She recommended hospitalizing J.J. for blood tests to determine if he had brittle bones. She did not tell J.J., the mother, that the test could be conducted on an ongoing, on an outpatient basis, keeping him in the hospital for just his safety. And then she knew that once he was admitted, the attending physician would not allow him to go home until the tests were completed. Therefore, the earliest that that could be was March 8th. Now, that seems to me to be the allegations you have to face. And now I have to, again, apply Ferguson. I would only disagree with court's characterization that the attending controlled whether or not the baby remained in the hospital. All other characterizations of the court, I think, are appropriate under the law, as this court should consider them. Our point is there is no law governing that situation, which gave Dr. Wong fair warning that what she did, call it an incomplete disclosure, if you will, was unreasonable detention or an unreasonable violation of the 14th Amendment familial rights. There's just no case law on that. The closest that we come is the Second Circuit's opinion in KOP, where the detention was held to be reasonable. The opinions in Mueller v. Alker, I think, Judge Trott. And I was there, too. Articulate, I think, that inherent tension that the court has just raised, that is that there is an inherent tension between child abuse detection and prevention, on the one hand, and the constitutional rights to be free from unwarranted intrusion, seizure, and interference with familial rights. This particular case, we argue, presents a unique opportunity for this court to give some guidance to the physicians in Dr. Wong's position who face this issue on a daily basis. There is simply no case law affording guidance. Ferguson is distinguishable on its facts. It did not involve any issue of child safety. It was undertaken solely for the purpose of securing incriminating evidence. In this case, Dr. Wong's request for the blood test was undertaken in an effort to try and rule out other causes which might have exonerated the implications of child abuse. Isn't that suggesting what you suggest the evidence would do rather than looking at the plaintiff's complaint, which I must do? I mean, the plaintiff's complaint would not suggest she had as her basic intent, if you will, just the injury of the child. But she was investigating. Consider this, Your Honor. The evidence before the court and as recited by the district court in its ruling on summary judgment, both for the county and for Dr. Wong's motion, recited the fact that Mr. Revis pressed Dr. Wong for a definitive diagnosis sometime around 8 or 9 in the evening. Dr. Wong declined to give a definitive diagnosis of child abuse. She was genuinely concerned about the possibility that this child had a condition which might exonerate the parents from the adverse influences drawn from the nature of the injuries themselves. I appreciate all of that. The problem that I had with all of that is this. Knowing that, knowing that the other workers asked her what she should do, not once did she suggest or even think about suggesting that they could take their child home. In fact, all she did was say, if they press it, let them go. That's correct, Your Honor. And? She wouldn't let them take the child. She wouldn't let them do anything with the child. But she's recommending the child go to the hospital and keep the child in the hospital. And not once did she say, you can take that child home. And when they asked if she should, she said, don't say anything, but if they press it, you can go. That's the allegations. That's a fair characterization. And I submit to the court, there is not a case in the legal landscape which says that that violates a constitutional right or that a doctor faced with a child who has injuries 95% predictive of non-accidental trauma has to disclose or should disclose to a mother reasonably suspected of being responsible for those injuries that she can take the child home. Well, wasn't one of her concerns that for an exit strategy for the child, that she had concerns that once the child's gone, she doesn't know what to do with them, and yet she had to get ready to go on the next day with whether she was going to report it or not, that she had to do, or it was in the reporting. So how does she, isn't that sort of an exigent circumstance that she has to, that she's confirmed with subjectively? And who, was it Revis's job to talk to the people or her job? Whose was that? The court, I believe, the comments are appropriate. It should be pointed out, however, that as soon as Dr. Wong learned that this boy had bilateral posterior fractured ribs, she initiated a report to the DCFS because those injuries are diagnostic of non-accidental trauma, as the euphemism used by the physicians, and you are absolutely correct. In deposition testimony, Dr. Wong readily admitted the reason, the predominant reason, she said, her exact word, the predominant reason she recommended hospitalization as opposed to doing blood tests on an outpatient basis, was she did not have a safe discharge plan for the baby to go home. Now, it's worthwhile to note she did not insulate the parents from this child. The parents were granted full access and stayed with this child over the whole weekend. She did order or asked her resident to order that a child sitter be sent with the baby, and that is an undisputed fact that the baby was in the company of a sitter throughout the weekend while this deliberative process took place. Why wasn't there a court order then to somehow? Pardon me? Why not a court order? Why didn't she sign off on an after David of some sort saying I think this child is in imminent danger? If she felt that it was, why wasn't there a court order? Unfortunately, Your Honor, California law does not permit physicians to seek court orders for that kind of relief. That has to be done by either law enforcement or DCFS. She reported, as mandated by the statute, to DCFS. She was not happy that it did not issue a hold. No one approached her to ask her for a declaration or an affidavit in support of a warrant. She would have gladly given one because she felt that there was exigent circumstances and unexplained history of this particular injury which indicated non-accidental trauma of a serious nature. So she was not legally entitled to seek a warrant or judicial review. That job, unfortunately, is put in the hands of law enforcement and social workers. I think a plausible argument, persuasive argument, could be made the legislature should remedy that situation, but it hasn't. One more question, please. Sure. What happens if a policeman comes up to her and he says, Dr. Wong, we're here, we're looking at this, and she tells them of all the reasons why there's probable cause. Now we're not talking about found suspicion. We're talking about probable cause. It's more likely than not that child abuse occurred at the hands of the parents. Is that a better remedy than to have them go out and seize the children then by the police officers or to have them put them in a hospital and or have the parents arrested for child abuse, even though it may wash out later on? Wouldn't that be a terrible way to proceed with these cases? I would submit that it is the lesser of the available options, the least favored option. It is, I think, important to recognize here that Dr. Wong did notify law enforcement immediately at the same time that she initiated the report to DCFS when she learned about the posterior bilateral rib fractures. Yes, I'm sorry. No, go ahead. I'm sorry. She did consult with the UCLA Police Department, who passed it off to the Santa Monica Police, and the Santa Monica Police interviewed Ms. Jones after Dr. Wong had made her recommendations for a CT scan and the CT scan had actually been performed. And it was after that interview that the Joneses were, they say, escorted or taken to the Ronald Reagan Emergency Room where they remained until about 8 o'clock when they asked if they could leave and Dr. Cooper explained that the CT results were negative for an intracranial bleed or a new fracture and that the blood test recommended by Dr. Wong did not require the baby to be hospitalized. Thank you. I think you've answered the question and we've let you go over, so I think we'll go to the next. Yes, 10 minutes over. Thank you, Your Honor. Good morning. My name is Robin Crowther. I'm with Caldwell, Leslie & Proctor, and I represent the Jones family, along with my colleague Michael Schaffler. Mr. Schaffler is handling the issues relating to the appeal on the decision relating to the county. And I have the issues relating to Dr. Wong. I'd like to begin, actually, at the end of Mr. Garrard's argument. What Mr. Garrard said was there was no law that gave Dr. Wong the authority to issue a hospital hold. That's absolutely true. There was no clearly established law in 2010, and there is none today, that gives a doctor authority to detain a child. In the state of California, for good reason, the obligations are divided. Those who may identify and suspect child abuse are required by the law to report them. And they may do so maliciously, fraudulently, without any basis whatsoever, and are absolutely immune from liability for those reports. The reason is because law enforcement and the Department of Child and Family Services in Los Angeles are tasked with investigating those claims and balancing them against the very important rights of the family to be kept together. Dr. Wong has never seen a warrant. She's never been trained about warrants. She doesn't know when you should seek a warrant. She doesn't know how long it takes. And that's not her job. She's a doctor. Had she acted as a doctor in this case and stayed within the confines of those obligations, there would be no claim against her. But she's in a unique situation. She is the head of the scan unit for this UCLA hospital. Does that put her in a different scenario here, especially when she's, I mean, you have all the social workers, law enforcement officers looking to her for guidance. That's the problem. Legally, her position as the director of the scan unit does not give her special protection. And while the social workers and the police officers may be looking to her for guidance, it is their job to decide when the Fourth Amendment rights of the child to be with his parents, and the parents' Fourteenth Amendment right to have custody of their child, are sacrificed to the safety of the child. She's not different from any other mandated reporter when she sees a dangerous situation. Her job is to report. And in this case, the Santa Monica Police Department declined to take custody of the child. The DCFS workers declined to take custody of the child until March 7th and 8th when there was miscommunication. And perhaps most important, when there was a hearing before a trial judge in the juvenile court a few days later on March 10th, the judge found insufficient evidence to take this child from his parents. But that's after the fact. It's not after the fact, Your Honor. I disagree. I mean, it's after the fact that the Saturday night evening of everything coming together, this crescendo, as I described it, of activity. So when exactly, from your point of view, was your client seized? On the evening of March 5th when G.J. was admitted to the hospital. That's when that happened. And I understand Your Honor's characterization of this as a crescendo and an emergency. But I think that the facts taken in the light most favorable to the Joneses actually go the other way. The injury to G.J. took place on February 24th. He was in the hospital until February 26th. There was a report made to DCFS, and DCFS took no action. Jill Jones came back to the clinic. At the recommendation of her doctor, her pediatrician. And Dr. Wong. And it should not be overlooked that the reason Ms. Jones was anxious to return was because she believed there was a problem with her newborn son's chest that the doctors continued to overlook. She was looking for medical advice. And when she got to the clinic, she went through the eye exams and they showed nothing. And then she went through the skeletal survey, which at trial the evidence will show was traumatic for her and her son. And then it wasn't until 1 o'clock in the afternoon when she met with Dr. Wong and when Dr. Wong saw her or the baby. But by that time Dr. Wong had already made her report. She already believed she had enough information to make a report of child abuse. And the authorities came and responded as they were supposed to do. Dr. Wong, as Mr. Garrard said, was frustrated that the social workers and the police officers would not issue a hold on this child. So instead she did their job. They had done it. Wasn't some of that frustration, as you described it, borne out by the fact that the child had gone home and the child was brought back and the new skeletal exam showed additional cracked ribs on the other side that were not readily identifiable from the other side. So that's what I mean. It accelerated things. And even though she made the report, now she's confirmed with an additional set of facts that are quite serious. It looks like that kid might be, unfortunately, the child is maybe breaking apart. What do you do with that? Her job is to act as a doctor, Your Honor. She didn't have, and her deposition testimony is clear, that she did not believe that that child, absent a suspicion of child abuse, needed to be in the hospital. There was no medical need and these tests would not be back for weeks. And that's the information that she did not share with Ms. Jones. But in her deposition, she said succinctly, absent suspicion of child abuse, the parents would have been free to decide to have those tests on an outpatient basis. And that's what makes this case different from the Mueller cases. In Mueller, you have the doctor saying, I think there's a risk of serious injury for medical reasons within the next 45 minutes. In this case, you've got a doctor who says, I think maybe someone is hurting this child. That is a police function. What basis, what training does a doctor have to identify who is harming the child? She identifies what has happened to this child and makes a diagnosis. She is not trained to say, it's the parents, it's Ms. Jones. She not even met Michael Jones at the time she decided she did not have a safe discharge plan and this baby should not go home. So I've heard all these allegations about this constitutional violation. What are your best cases that she should have known? I think the case that is most applicable to a doctor is the Ferguson cases that were mentioned earlier. But that involved a policy. It did. It involved a policy of why they were collecting the data. This one involved new medical evidence, not subject to a defined policy of why they implemented that particular program. Yes, Your Honor, but it wasn't the policy that made the acts in Ferguson unconstitutional. What made them unconstitutional is that they were unquestionably searches without a warrant. Here we have unquestionably a seizure without a warrant. It's unconstitutional unless one of the exceptions applies. The exceptions are consent and exigency. Both of those issues are traditionally issues of fact that should go to a jury. And we're here post-summary judgment. The district court properly denied summary judgment and said those factual issues should be determined by a jury. The only difference in Ferguson was that you were looking at a search, and the doctors in the hospital in that case argued that the medical consents were sufficient for the Fourth Amendment. And the Supreme Court said that's not right. If you want to rely on a medical consent in a law enforcement setting, there must be specific disclosures. And what our evidence ---- I think it depends, Your Honor, on what you define as her particular situation. For qualified immunity, even the most recent Al-Kid case from the Supreme Court says it doesn't need to be on the precise set of circumstances. I appreciate that, but I'm ---- This was in a hospital. It was. Does that change the law and whether it was clearly established? And she's a doctor. Does that change the law and whether it was clearly established? What I think was clearly established is the cases have said since the 1980s, the White v. Pierce case and running through the Green case, that the Fourth Amendment applies in child abuse investigations. So that is clearly established. And what does the Fourth Amendment mean when it comes to detaining children? Rogers says that you must have a warrant, exigency, which means something that's going to happen in the amount of time when a warrant would be sought that justifies taking custody of the child or consent. So it's not on all fours, and I don't want to obey the question. We don't have questions about doctors. But I submit that's because doctors don't take custody of children. But what happens when she gives her opinion as to what's going on and her opinion of things to Mr. Revis? He's the deliverer of the news. He's the one that talks to the family about all these things. She's removed. So it's their contact with Mr. Revis, the investigator, the health investigator, child investigator, and she's one step removed. So how is it that she caused the seizure at that point? The critical evidence, Your Honor, comes from the documents we put in showing the communications between Dr. Cooper, Dr. Wong, and the Joneses. There are notes where Dr. Cooper communicates to Dr. Wong and says the family wants to leave, but will stay if we say it is necessary. And Dr. Cooper also tells the Joneses that it must be Dr. Wong who decides whether they have to stay. And Mr. Revis testifies that the Joneses are willing to stay if there is a medical necessity for their son. So who tells them whether there's a medical need? Having communicated to them that their child had potentially a life-threatening injury. So having spoken, it was incumbent upon Dr. Wong to correct any misrepresentation. It was her job to make sure that someone told them their son did not have a new skull fragment fracture, bleeding on his brain, and broken legs, which is the information she told them when they agreed to admit him to the hospital. So there are other people who could have. It was her job because she made the first statement to begin with. Does it matter that the Joneses were able to stay at the hospital and visit with CJ, that he wasn't physically removed and taken to another location? I don't believe it does, Your Honor. The test for whether there was a seizure under the Fourth Amendment is would a reasonable person have felt free to leave. And in this case, because obviously the newborn could not leave himself, whether his parents felt free to remove him from the circumstances. The DCFS manual clearly identifies a hospital hold as a detention under the Fourth Amendment and says that it requires a warrant. The law in CHIA-P talks about holding a child in a hospital as a detention, implicating the Fourth Amendment. It is a detention. The question I think that being in a hospital might change is whether or not there was exigency, because certainly medical situations could present exigency, but that's an issue of fact. Even in the Mueller cases, which ultimately were decided in favor of the defendants, the issue of imminent harm went to the jury, and that's what should happen here. I submit that because Dr. Wong could never get a warrant, she should not then be allowed to skip directly to the exceptions to the Fourth Amendment, and that even if there was exigency, this is not someone who would ever believe that she was entitled to take custody of a child. That's where I think the White case is instructive and the Calabretta case is instructive. What those cases say is everyone knows that they're going into the home, that you cannot go into a home without a warrant. Every doctor knows they can't take custody of children. Dr. Wong knew. That's her statement to Dr. Castro. We can't keep the baby here. You have to let them leave and call DCFS. She had no question that she had no right to detain the child. And what cases told her that she couldn't misrepresent his medical condition to the parents? Ferguson. Once she decided that this hospitalization was for law enforcement, investigative, protection of the child, that it was about child abuse, that's when she had to tell the Joneses, I don't think there's a medical need for your son to stay in the hospital, but I'm asking you to leave him here so that we can investigate what happened. And then they make the decision. That's the right in question. It's to make decisions for our children about whether this baby with a serious head injury should be at home healing with his parents or in a hospital room being interrupted every hour with a sitter nearby and a bracelet and law enforcement coming around asking questions. The Joneses were entitled to decide whether they wanted to subject themselves to that or not. And they do. I think we understand your argument. Thank you. I give you both extra time. I don't really think we need any rebuttal. You had an extra ten minutes. I had a good walk this morning. Thank you. I think the court's questioning indicates that the court understands what's at issue here and what is important to consider. Thank you for your consideration. Well, this is a tough case, and I'll be fair, I just want to be straight up. Great arguments from both sides. I very much appreciated your both sides helping us to understand, because this is tough law. I was Mueller. I understand where we are in these particular cases, so I really appreciate it. Thank you very much. All right. This is case 12-55995, Jones v. Wong. That's been submitted.
judges: McNamee, Smith, Murguia